MR. JUSTICE SHEA
dissenting:
I would refuse to allow the death penalty to be imposed. In its first decision, this Court clearly indicated that the death penalty was not to be considered at the resentencing. This Court, moreover, has reached unfairly into application of retroactive statute to permit the death penalty to again be imposed. Finally, assuming arguendo that the sentencing court could properly apply the 1977 death penalty statutes to the 1974 crimes, it did not properly apply the law, nor did this Court properly perform its mandatory review duties under the 1977 statutes.
After defendant had entered his pleas of not guilty to count I (deliberate homicide), count II (aggravated kidnapping), and count III (sexual intercourse without consent), the court, of its own motion amended the aggravated kidnapping charge by adding the following language: “the alleged actions of the defendant resulted in the death of Peggy Lee Harstad.” Defendant objected to such amendment, but to no avail.
The case was then tried and submitted to the jury on all three counts, and the jury was given general verdict forms on each count. But the trial court, because of its own amendment of count II, also submitted a special verdict or special interrogatory to the jury asking it if the aggravated kidnapping “resulted in the death of Peggy Lee Harstad.” The jury, in addition to returning guilty verdicts on all three counts, answered the special interrogatory in the affirmative that the aggravated kidnapping “resulted in the death of Peggy Lee Harstad.” Defendant also had objected to the submission of the special interrogatory to the jury.
In the first Coleman appeal, this Court ruled against the defendant on both issues. As to the trial court’s amendment of count II, after defendant’s plea, and over defendant’s objection, this Court *338 held that the amendment was one of form rather than substance because defendant was at all times aware that the State was seeking the death penalty. (Coleman, 579 P.2d at 732). However, this Court then stated the crux of its holding in relation to the amended information:
“In any event, no legal prejudice" resulted from the amendment of Count II in the light of our holding that Montana’s death penalty statute as it existed in 1975 is unconstitutional.” 579 P.2d at 746.
This language clearly indicates that this Court did not believe that upon the case being remanded to the District Court for resentencing that the death penalty would be reimposed by applying the 1977 statutes to the 1974 crimes.
Moreover, the language of this Court’s opinion in the first Coleman appeal concerning the submission of the special interrogatory to the jury leads to the same conclusion. This Corut ruled that the submission of the special interrogatory to the-jury did not undermine the general verdicts also submitted to the jury. 579 P.2d at 751. But, again, the crux of this Court’s holding on this issue, is stated as follows:
“In any event, our holding on Montana’s death penalty statutes renders this specification of error nonprejudicial.” 579 P.2d at 751.
These holdings on the questions of the amended information and submission of the special interrogatory to the jury, are a clear indication that this Court did not believe that defendant would be subject to the death penalty upon his resentencing. These holdings, moreover, are a clear directive to the District Court that capital punishment was to be eliminated from its consideration. But, of course, it was the desire of the District Court to inflict the death penalty if there was any way possible, and therefore it chose to interpret this decision otherwise.
In its findings, conclusions, judgment, and order of death, dated July 14, 1978, the District Court summarized what it considered to be the essence of this Court’s holding in overturning the first death sentence. (I note parenthetically, that its summary was a foregone *339 conclusion, for on June 2, 1978, the same day as the remittitur of this Court arrived at the District Court, it set out an order to counsel for both sides that sentencing could be carried out pursuant to the 1977 death penalty statutes.) In any event its legal position is revealing:
“. . . The Court limited its decision on overturning the death penalty to the absence of procedural requirements allowing the trial court to consider any mitigating circumstances in its imposition of a penalty under the unconstitutional death penalty statute. . . .
“. . . The statute as amended was declared unconstitutional in this case, but the Supreme Court in remanding for resentencing did not specifically declare if the trial court could or could not impose the death penalty. Coleman argues that since the mandatory statute was declared unconstitutional, Coleman cannot be sentenced'to death under laws enacted after his conviction. (Emphasis added.)
“The Supreme Court at page 11 of its opinion indicates that if the death penalty had been imposed under proper procedural safeguards, the sentence would have been upheld. The Court states:
“ ‘To have a constitutionally valid death penalty, the United States Supreme Court has established certain necessary procedures. (Citations.) None of these required procedures are present in Montana’s death penalty statute as it existed in 1975, nor were they provided otherwise in this case. (Emphases added.) Thus defendant’s death sentence cannot stand.’ (Emphasis is the trial court’s.)
“The emphasized language strongly suggests that if the sentencing court had observed procedural requirements declared by recent U.S. Supreme Court decisions, the death penalty would have been upheld notwithstanding that Montana’s mandatory law was unconstitutional. (Emphasis added.)
“The later enactment of sections 95-2206.6, et seq., spelling out the procedure, should not operate to take away the court’s power to impose the death penalty under proper procedural safeguards. The *340 death penalty is an operative fact under the Montana Constitution and section 95-5-303, R.C.M.1947, and are not to be ignored because a procedurally effective statute is abrogated and other statutes are substituted therefor. As argued by the State from the Dobbert case, the circumstance that the defendant is afforded greater procedural protection by the trial court’s utilization of sections 95-2206.6, et seq., does not fall within the prohibition of ex post facto laws.
“In summary, the trial court in now pronouncing sentence is in a position to utilize the interim developments in sentencing procedure as reflected in recent U.S. Supreme Court decisions and the Montana statutes enacted in response thereto.”
The court then listed its findings and conclusions and entered its order sentencing defendant to death for the second time.
The sentencing court obviously milked the majority decision as much as it could in order to arrive at a decision that would allow a reconsideration of the death penalty. True, this Court did not explicitly direct the District Court to eliminate the death penalty from its consideration. But a fair reading of our decision on the questions of the amended information and the special jury interrogatory leads to that conclusion.
The sentencing court concludes its original death penalty would have been approved if only it had the foresight to allow the defendant to present mitigating circumstances at a presentence hearing. Not only is this a misreading of the opinion by the District Court, but it is clear that such procedure would not have been approved. For the statutes themselves must provide for the presentencing hearing permitting evidence of aggravation and mitigation. As I covered the statutory requirements in my dissent in State v. McKenzie (1978), 177 Mont. 280, 581 P.2d 1205, 1266-1277, it would serve no useful purpose to again set forth these requirements as mandated by the United States Supreme Court. It is sufficient to say that the District Court is sadly mistaken.
It is equally clear that the trial court was interested only in applying Dobbert to the facts of this case and that it did not consider *341 either the ex post facto provision in the Montana Constitution, or the statutory directive of section 12-201, R.C.M.1947, which prohibits any retroactive application of a statute unless it is specifically provided for in the statute. I must admit, however, that I am even more amazed by the majority’s application of these laws to the facts of this case. It is a clear demonstration of what can happen when the law 'is not allowed to get in the way of the result.
It is unfortunate indeed that the majority has chosen to join lock step with the United States Supreme Court, and not only in interpreting the United States Constitution. The only reference the majority makes to the ex post facto provision of our own Constitution is where it sets forth the issue raised by the defendant:
“The next issue with which we are confronted is whether ex post facto provisions in the federal and state constitutions or the statutorily codified rule of construction against retroactivity (section 12-201, R.C.M.1947, now section 1-2-109 MCA) prevent application of the sentencing statutes enacted in 1977 to this defendant . . .” (State v. Coleman, Mont., 605 P.2d 1010, 1979.)
The statement of the issue ‘in this way constitutes a forewarning that all issues are going to be decided by one standard — the standard set forth by the United States Supreme Court in Dobbert v. Florida (1977), 422 U.S. 282, 92 S.Ct. 2290, 53 L.Ed.2d 344. Why this Court consistently refuses to give more substantive meaning and protection to our own constitutional provisions as opposed to that given by the United States Constitution, I cannot understand. The United States Supreme Court is not the sole repository of all wisdom. Nor can it be the final authority on the interpretation of the Montana Constitution.
Though we must accord all people every right to which they are entitled under the United States Constitution, there is nothing which prevents us from according them even more fundamental protection under our own Constitution. Article II, Section 31, 1972 Montana Constitution provides:
“No ex post facto law nor any law impairing the obligations of contracts, or making any irrevocable grant of special privileges, *342 franchises, or immunities, shall be passed by the legislature.” (Emphasis added.)
Under this provision, I would hold that no law passed by the legislature after the commission of the crime, whether denominated substantive or merely procedural or ameliorative can be applied to permit a sentence of death, if the statutes applicable at the time of the commission of the crimes, were constitutionally deficient, and hence would not permit the imposition of the death penalty. The frailties of mankind (and judges must be included in this reference) are such that a man’s life should not be subject to the hair-splitting mischief inherent in interpreting a retroactive application of the law.
In the first Coleman decision, we declared the provision calling for mandatory execution in the event of a conviction of the crime of aggravated kidnapping leading to the victim’s death, to be unconstitutional. 579 P.2d at 741-742. Under the statutes then existing, defendant could not constitutionally be sentenced to death. For this reason, I would declare that the 1977 death penalty statutes (however they be denominated — substantive, procedural, ameliorative, or whatever) could not constitutionally be applied to defendant. Accordingly, the trial court had no authority to again sentence defendant to death.
Nor do I believe that there is any excuse of the majority’s failure to give the defendant the benefit of a doubt in interpreting section 12-201, R.C.M. 1947 (now section 1-2-109 MCA). That section falls within the chapter containing the rules of construction which are to apply to all statutes in the State of Montana. Section 12-201 provides:
“No law contained in any of the codes or other statutes in Montana is retroactive unless expressly so declared.” (Emphasis added.)
The only reasonable interpretation of this statute is that the 1977 death penalty statutes can apply to the defendant only if the legislature expressly declared that these statutes were to have retroactive effect. Not only is there a total lack of express declaration that the 1977 death penalty statutes are to be retroactively ap *343 plied, but there is no room even to imply that the legislature intended them to have a retroactive effect. (See sections 95-2206.6 through 95-2206.15, R.C.M.1947, now sections 46-18-301 through 46-18-310 MCA). The statutes contain no directive for retroactive application.
This statute prohibiting retroactive application of legislative acts does not distinguish between retroactive application of a procedural statute or retroactive application of a statute that is considered substantive. It prohibits retroactive application of any statute — period — unless it is “expressly declared” to have retroactive application. This hair-splitting business of distinguishing between a substantive law and a procedural law must stop when a man’s life literally hangs in the balance.
This Court has also ignored fundamental case law previously adopted by this Court in interpreting section 12-201. Because it is a rule of construction which applies to all statutes enacted by the legislature, it will not be given retroactive effect unless expressly so declared. State ex rel. Whitlock v. State Board of Equalization (1935), 100 Mont. 72, 84, 45 P.2d 684. This holding does nothing more than to give full meaning to the express language of section 12-201. This Court also held that statutes are intended to operate prospectively only, in the absence of a contrary intention clearly expressed in the statutes, and that every reasonable doubt is resolved against a retroactive application of a statute. State ex rel. Mills v. Dixon (1923), 68 Mont. 526, 528, 219 P. 637.
The death penalty statutes enacted in 1977 were not expressly declared by the legislature to-be retroactive in application. The statutes are silent. It is presumed therefore, that they were intended to operate only prospectively. Other than an emasculation of the law there is no way that this Court should have declared them, in essence by judicial fiat, to operate retroactively. Section 12-201 prohibits such interpretation; Whitlock, supra, solidifies this statute; and Dixon, supra, clearly establishes that every reasonable doubt should be resolved against retroactive application of a statute. If there are not legitimate policy reasons in a death penalty *344 case to resolve a reasonable doubt against retroactive application in order to save a man’s life, I cannot conceive of another instance where such policy reasons would exist. By suspending the operation and effect of section 12-201, this Court has inflicted a grave injustice upon the defendant — one that can never be rectified.
There is, moreover, another statute which this Court, as well as the trial court, totally ignored in reaching its decision. Section 43-507, R.C.M.1947 (now section 1-2-201(1) MCA) provides:
“Every statute, unless a different time is prescribed therein, takes effect on the first day of July of the year of its passage and approval.”
The death penalty statutes (sections 95-2206.6 through 95-2206.15) provide no time as an effective date. Accordingly, they were effective as of July 1, 1977. Though the majority ignored this statute, it does appear that somehow they would have avoided its application to the defendant’s case. But, at least they owed the defendant an explanation.
Conceding arguendo that it was proper to apply the 1977 death penalty statutes to the 1974 crimes, it is still abundantly clear that the trial court failed to follow the statutes, and that this Court failed to fulfill its statutory functions under the mandatory review provisions of the statutes. For these reasons also, the death penalty should not be allowed to stand.
To place this second sentencing in proper perspective with the first sentencing, I digress to the circumstances surrounding the first trial insofar as they are pertinent to the imposition of the first death sentence.
The aggravated kidnapping statutes called for the mandatory infliction of the death penalty if the victim died as a result of the kidnapping. (Sections 94-5-303, and 94-5-304, R.C.M.1947.) Originally the State did not allege in Count II of the information (the aggravated kidnapping charge) that the victim died as a result of the kidnapping. But after the defendant had entered his plea, and over defendant’s objection, the trial court, on its own motion, amended Count II to allege also that the victim died as a result of the kidnap *345 ping. As so often is the case, this Court does not know why the trial court did this, but it appears that it believed that the lack of this allegation would be fatal to the imposition of a death penalty if defendant was convicted of aggravated kidnapping. The trial court followed up this allegation by submitting a special interrogatory to the jury, asking it to determine whether or not the victim died as a result of the kidnapping. In addtion to returning a general verdict of guilty to the charge of aggravated kidnapping, the jury answered the special interrogatory in the affirmative — that is, that the victim did die as a result of the kidnapping. The state was then set for the imposition of the mandatory death penalty.
Based on the amended information and the jury’s answer to the special interrogatory, the trial court, without ordering a presentence investigation, and without holding a presentence hearing to permit presentation of evidence as to aggravation and mitigation, sentenced the defendant to death. I add here that the then existing statutes did not require a presentence investigation or a presentence hearing. Indeed, it would have been useless to do so, because the statutes required the imposition of the death penalty, and pursuant to the amended information and the jury’s answer to the special interrogatory, all that remained was for the court to impose the required death penalty. It was this imposition of the mandatory death sentence that this Court declared unconstitutional in the first Coleman appeal. 579 P.2d at 741-742.
It is fair to say that the extraordinary activities of the trial court in amending the information and in submitting the special interrogatory to the jury, suggest at a minimum that he had more than an ordinary interest in setting the stage for the eventual imposition of the death penalty in the event of a conviction on the count of aggravated kidnapping. This then, was the state of mind of the sentencing judge as he again prepared to sentence the defendant after the first Coleman appeal.
It is revealing to set forth the background of how the sentencing judge set up the second imposition of the death penalty for the defendant. This Court decided the first Coleman case on April 26, *346 1978, and the petition for rehearing was not turned down until May 30, 1978. But in the meantime, the sentencing court was active. On May 2, 1978, he entered an order (with copies sent to all counsel of record) that defendant was to be immediately returned to the Custer County jail and held there pending presentencing investigation and sentencing. The sentencing judge simply did not bother to wait until the case had been returned to him after the denial of defendant’s petition for rehearing.
On June 2, 1978, the presentence investigation report was submitted to the court with the notation in the report that the sentencing judge “is still awaiting some type of legal papers from the Supreme Court and that sentencing will not be set until such papers arrive.”
Apparently the papers arrived that same day, for on June 2, 1978, the sentencing court sent out an order to all counsel of record that the sentencing hearing would take place on June 14, 1978 in the Custer County Courthouse, and that the hearing would be conducted “in accordance with Sec. 95-2066.6 through 95-2206.11, R.C.M.1947, as amended” (the 1977 death penalty statutes). It appears from this that the prosecution had kept the sentencing judge well abreast of the developing law from the United States Supreme Court, namely, Dobbert v. Florida (1977), 432 U.S. 282, 92 S.Ct. 2290, 53 L.Ed.2d 344. I have previously discussed in this dissent the point that the trial court ignored the ex post facto provision in the Montana Constitution, and section 12-201 of our statutes.
With the decision of the sentencing court from the inception that it would apply the 1977 death penalty statutes, we are now in a position to examine those statutes, sections 95-2206.6 through 95-2206.15, R.C.M.1947 (now sections 46-18-301 through 46-18-310 MCA) and sections 94-5-102 and 94-5-303 (now sections 45-5-102 and 45-5-303 MCA).
Under the 1977 statutes, section 95-2206.6, provides that if there is a conviction in which the death penalty may potentially be imposed, the sentencing judge must conduct a mandatory presentence hearing to determine if any statutory aggravating circumstances *347 exist under section 95-2206.8 and if any statutory mitigating circumstances exist under section 95-2206.9. The scope of the hearing is set forth in section 95-2206.7:
“Sentencing hearing — evidence that may be received. In the sentencing hearing, evidence may be presented as to any matter the court considers relevant to the sentence, including but not limited to the nature and circumstances of the crime, the defendant’s character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty. Any evidence the court considers to have probative force may be received regardless of its admissibility under the rules governing admission of evidence at criminal trials. Evidence admitted at the trial relating to such aggravating or mitigating circumstances shall be considered without reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.”
I note in this respect, and I will develop this point later, that an evidentiary hearing did not in fact take place. The State presented no evidence in aggravation, apparently content that the sentencing court would later find that the victim died as a result of the kidnapping. But neither did the defendant present any evidence. He did not take the witness stand, nor did anyone else in his behalf, nor was any documentary evidence presented in his behalf. Other than the trial transcript, the only sentencing background the court had was contained in the presentence investigation report.
The statutory aggravating circumstances are set forth in section 95-2206.8:
“Aggravating circumstances. Aggravating circumstances are any of the following:
“(1) The offense was deliberate homicide and was committed by a person serving a sentence of imprisonment in the state prison.
“(2) The offense was deliberate homicide and was committed by a defendant who had been previously convicted of another deliberate homicide.
*348 “(3) The offense was deliberate homicide and was committed by means of torture.
“(4) The offense was deliberate homicide and was committed by a person lying in wait or ambush.
“(5) The offense was deliberate homicide and was committed as a part of a scheme or operation which, if completed, would result in the death of more than one person.
“(6) The offense was deliberate as defined in subsection (l)(a) or 94- 5-102 and the victim was a peace officer killed while performing his duty.
“(7) The offense was aggravated kidnapping which resulted in the death of the victim.” (Emphasis added.)
For purposes of this case only, subsection (7) (which is emphasized) is important. In specific written findings of fact as to subsections (1) through (6) the sentencing court properly found that the aggravating circumstance did not apply to the facts of this case.
The statutory mitigating circumstances are set forth in section 95- 2206.9:

“(l) The defendant has no significant history of prior criminal activity.

“(2) The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
“(3) The defendant acted under extreme duress or under the substantial domination of another person.
“(4) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
“(5) The victim was a participant in the defendant’s conduct or consented to the act.
“(6) The defendant was an accomplice in an offense committed by another person, and his participation was relatively minor.
“(7) The defendant, at the time of the commission of the crime, was less than 18 years of age.
*349 “(8) Any other fact exists in mitigation of the penalty.” (Emphasis added.)
For purposes of this case only subsections (1) and (8) (both emphasized) are important. The trial court properly found an absence of mitigating circumstances listed in subsections (2) through (7) and entered specific findings as to each negating the existence of the mitigating circumstance. But as I will later develop, the sentencing court totally misapplied the law in relation to subsection (1), and failed to negate the existence of “Any other fact exists in mitigation of the penalty” as provided for in subsection (8).
Explicit findings as to the existence or nonexistence of aggravating circumstances or mitigating circumstances, are mandated by section 95-2206.11:
“Specific written findings of fact. In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances set forth in 95-2206.8 and 95-2206.9. The written findings of fact shall be substantiated by the record of the trial and the sentencing proceeding.” (Emphasis added.)
The statute supposedly enacted to guide the sentencing court in this decision as to whether or not to impose the death penalty, section 95-2206.10 provides:
“Consideration of aggravating and mitigating factors in determining sentence. In determining whether to impose a sentence of death or imprisonment, the court shall take into account the aggravating and mitigating circumstances enumerated in 95-2206.8 and 95-2206.9 and shall impose a sentence of death if it finds one or more of the aggravating circumstances and.finds that there are no mitigating circumstances sufficiently substantial to call for leniency. If the court does not impose a sentence of death and one of the aggravating circumstances listed in 94-2206.8 exists, the court may impose a sentence of imprisonment for life or for any term authorized by the statute defining the offense.” (Emphasis added.)
Under this statute, a death penalty cannot be imposed unless *350 there is at least one aggravating factor. But if there is at least one such aggravating factor, it does not require the sentencing court to give any weight at all to mitigating factors. Rather, the sentencing court, in its infinite wisdom, and untrammeled discretion, is permitted to sentence to death if he finds at least one aggravating factor and a thousand mitigating factors. All he must state is that the mitigating factors are “not sufficiently substantial to call for leniency.” Under this statute, a defendant is totally at the mercy of the sentencing court as to what weight, if any, it chooses to give to mitigating factors. The only factors which may save a defendant from the death penalty are the identity of the sentencing judge and his personal attitude about whether or not he should impose the death penalty. This is worse than a game of Russian roulette for the defendant does not even get a chance to turn the cylinder to see which judge he draws.
In any event, the above is the statutory scheme under which the judge entered his findings, conclusions, order and judgment, on July 10, 1978. But before discussing his findings, conclusions, order and judgment, the fact surrrounding the commission of the crimes are important for several reasons, but primarily for the reason that they show the deep involvement of defendant’s accomplice, Robert Dennis Nank, in every facet of the crimes, and yet Nank has avoided the death penalty. The facts I state here are taken from the presentence report filed on June 2, 1978, which were in turn taken from the State’s brief on appeal, filed November 17, 1977, with this Court. I quote verbatim from the presentence investigation report:
“On July 4, 1974 he and Dewey Coleman were sitting in a park in Roundup, Montana. They were destitute financially and made a decision to burglarize a home in Roundup where they sold [stole] several rifles, and, at the Roundup airport buried the same. [As I will later demonstrate, the trial court improperly relied on this in sentencing Coleman to death.] They decided that, because they were destitute financially and low on gas for the motorcycle on which they were traveling, it would be necessary for them to *351 burglarize someone else and to kill them to destroy the evidence. As they proceeded east from Roundup to Forsyth, Nank’s motorcycle ran out of gas approximately five miles west of Vananda, Montana. They attempted hitchhiking, but were refused by an elderly couple who stopped to determine what was the matter. This occurred about 10:00 o’clock P.M. Shortly thereafter, Miss Harstad offered the pair a ride and continued easterly down U.S. 12. At a location about nine miles west of Forsyth where Nank, sitting next to Miss Harstad, turned off the key for the ignition and steered the car to a stop. Nank held the girl while Dewey Coleman drove the vehicle back to their motorcycle which was out of gas. They picked up their motorcycle helmets and a rope used to tie luggage to the motorcycle and again proceeded east down U.S. 12. North of Vananda, about a half mile from the highway, the two attempted sexual intercourse with Miss Harstad. Despite her pleas Coleman had intercourse with her. She was in menstruation at the time. Nanks also attempted intercourse, but failed because of a lack of penal erection. Nank did assist in holding Miss Harstad while Coleman had intercourse and also gratified his desire to stroke Miss Harstad’s feet. Following sexual intercourse they tied Miss Harstad with a rope and traveled in her vehicle with her through Forsyth to Rosebud, Montana and returned west from Rosebud to Forsyth. West of Forsyth they crossed a bridge over the Yellowstone River and proceeded again east down a dead end road on the north side of the river. Nank carried the girl, now clothed, from the car towards an abandoned Milwaukee Railroad Depot and across the railroad tracks. While Nank held the girl over his shoulder, Coleman came from behind swinging his silver motorcycle helmet by the chin strap and crashed it against Miss Harstad’s skull. Nank dropped her to the ground and Coleman proceeded to hit Miss Harstad several more times with the helmet. Since she was not dead, the two attempted to strangle her with a rope. Then Coleman alone attempted strangulation. Thinking she was dead, the two carried her down the embankment in a seclusion of trees and heavy brush and threw her into a puddle of water which was caused by the overflowing Yellowstone River. However, the young lady had *352 not expired and she stood up in the water. At this point, both Nank and Coleman went into the water. Coleman held her lower body and Nank held her head under water until she was drowned. ” (Emphasis added.)
So far as the record is concerned, it is from these facts only that the sentencing court again imposed the death sentence. The findings and conclusions are devoid of any other factors which entered into the decision of the sentencing court.
What did happen at the June 14, 1978 sentencing hearing? The State presented no evidence in aggravation; and the defendant did not testify himself or present other testimony, or present documentary evidence. The prosecution tried unsuccessfully to call the defendant to the witness stand. Before the conclusion of the proceedings on that day, however, the presentence investigation report was formally filed by the sentencing court and made an official part of the record. Each party was given an opportunity to examine the parole and probation officer who prepared the report, but each declined. The prosecuting attorney formally declared that, “I have read the report and I don’t have any objection to any of the material in the report.”
During this hearing, the court commented on one portion of the presentence investigation report in relation to defendant’s criminal background, and I will later develop the importance of this comment in relation to the eventual findings of the sentencing court;
“. . . The significant part of it [the presentence investigation report] relative to mitigating circumstances, is that the defendant has never been convicted of any felony prior to this charge.” (Emphasis added.)
Being that neither party presented any formal evidence, it was also agreed that the parties would present to the court through their briefs what they considered to be aggravating and mitigating circumstances, respectively. It appeared that the prosecutor would also present proposed findings and conclusions, but that the defendant did not indicate whether or not he would present proposed findings and conclusions. There is no. question, however, that he *353 knew he was given the right to do so. The June 14, 1978 presentencing hearing was then adjourned. The next time the parties would again meet in court was July 10, 1978 when the sentencing judge came to court with his sentence of death in hand.
This Court does not have the briefs that were exchanged between the parties and the court from the time of the June 14, 1978 presentence hearing and the date set for the sentencing. Nor do we have the proposed findings and conclusions submitted to the court by the prosecutor.
On July 10, 1978, the judge came to court with findings, conclusions, judgment, and order of execution, already prepared. As a formality, however, the sentencing court permitted defense counsel (and the prosecutor) to make final arguments against and for the death penalty. Insofar as the defendant is concerned, this situation can be likened to permitting final arguments to a jury only after the jury had returned with its verdict. Defense counsel did ask the sentencing court to consider matters contained in the presentence investigation report, including the fact that defendant did not have a previous criminal record before the particular crimes here, and that the crimes committed were totally inconsistent with his previous behavior as established by residents in Great Falls, Montana, who had known defendant for some time. He also asked the court for leniency because Nank, who was an admitted accomplice of the defendant, had committed exactly the same crimes as defendant, but through plea bargaining and turning state’s evidence, was not given the death penalty. He also argued that defendant was not being treated equally by either the prosecutor or the court because he was black, and argued that the judge’s orchestration of certain matters during the first trial showed his prejudice. Moreover, defendant again maintained his innocence of the crimes.
It was clear that the clean record of the defendant before the crimes involved here, bothered the sentencing court. Not that the court wanted to show leniency because of the clean record, but that the court did not know how to handle the matter. Eventually, the *354 court rationalized defendant’s situation to the fact that he had just never been convicted of any previous felony:
“. . . The one mitigating circumstance is that the defendant has not prior to this time been convicted of a felony, but in view of the enormity of the crime committed, and the Court’s feeling that this one circumstance does not overcome the aggravated circumstances, I have made findings to this effect, written findings as required by law. Also I have made conclusions and judgment which have been furnished to the defendant and the state at this time, and I will only at this time read the Court’s conclusions and judgment . . (Emphasis added.)
After the sentencing court made this statement, it stated for the record that it would not read its written findings into the record, but would simply read its conclusions and judgment into the record — whereupon defendant was sentenced to death. Before appealing to this court, defendant petitioned the sentencing court for a reconsideration of the sentence, but was turned down. Automatic appeal to this Court followed, pursuant to the provisions of sections 95-2206.12 through 95-2206.15 (now sections 46-18-307 through 46-18-310 MCA).
Before discussing some of the crucial issues relating to the sentencing itself, the trial court’s memorandum in justification of turning down defendant’s petition for reconsideration, is revealing. In this petition, defendant contended, among other things that: defendant had a right to present argument to the sentencing court before the sentence of death, and that this right was denied because the court already had its order of execution prepared when the court formalistically allowed defendant’s counsel to make his arguments; the sentencing court had failed to take the presentence investigation report into account; the sentencing court had in essence found defendant guilty of previous criminal conduct by relying on the uncorroborated testimony of Nank that he and defendant had burglarized a home in Roundup, Montana, and stole some rifles, on the same day as the crimes involved here; and that the sentencing court totally failed to consider the favorable treat *355 ment given to Nank who had admitted the same crimes for which defendant stood convicted.
In its July 31, 1978 order denying the petition for reconsideration of the sentence, the trial court failed to mention any of these arguments, and seemed to ground its order on its conclusion that defendant was merely rehashing old arguments already presented. But the order is revealing for what it says about mitigating circumstances:
“A pre-sentence hearing was conducted on June 14, 1978, at which time defendant and his counsel were given an opportunity to present any matter in mitigation, but defendant declined to take the witness stand and failed to otherwise present any evidence in mitigation.
“The court then prepared its findings and conclusions based upon the aggravating and mitigating circumstances known to the court. A day for sentencing was then set, at which time counsel for defendant gave a discourse on matters previously presented by brief to the trial court on the motion to quash, and to the Supreme Court on the appeal.
“Coleman at the sentencing hearing was given the opportunity to present any mitigating circumstances he might choose, but declined to do so, which distinguishes Lockett from the instant case. Other than the mention of the Lockett case, the final oral argument of defendant’s counsel and the petition for rehearing raise no new matter not previously considered by the court at the time of the preparation of the trial’s court’s findings and conclusions.
“Now, Therefore, It Is Ordered that the petition for rehearing be denied.” (Emphasis added.)
The undeniable fact is that other than the circumstances of the crimes as divulged by the trial itself, the only information of record that the sentencing court had before it sentenced defendant to death, was the presentence investigation report. But, the sentencing *356 court totally ignored this report, with the exception of the defendant’s criminal background.
The presentence investigation report contained the following subject headings: (a) Criminal History; (b) Official Version of Crime and Defendant’s Version of Crime; (c) Physical Description and Condition (of the defendant — this section includes references to several psychological tests and profiles of the defendant; (d) Family and Social Background; (e) Educational and Vocational History; (f) Marital History; (g) Military History; (h) Summary and Conclusion. A sentence of death is immediately suspect when the findings in support of that sentence are entirely devoid of any considerations other than the circumstances of the commission of the crime itself. Not once did the sentencing court refer to the defendant’s history or background. It is almost like the sentencing court entered an order for the extermination of an inanimate object, certainly not a living, breathing human being.
Since the sentencing court and the majority opinion provide no facts as to defendant’s background, I believe it is imperative to do so. I take this background from the-only source there is of record, the presentence investigation report.
Dewey Coleman is a black man, born October 26, 1946, in Missouri, the son of a boilermaker and housewife. There were nine brothers and sisters in his family. At the age of fourteen, he ran away from home, but some time later he returned to Missouri. He graduated from high school in 1964. His father died in 1964 and his mother died in 1972. As of January 20, 1975, only four brothers and sisters were known by him to be alive. He apparently has had no contact with his family since that time.
From 1965 to 1972, he was in the United States Navy. He was discharged in 1969 but was recalled to active duty very shortly thereafter. He attained the rank of E-5 and was primarily involved in doing clerical work. During this time he also received approximately two years of education at a junior college and through correspondence courses. He received his discharge from the Navy in *357 1973 and apparently is on disabled classification as a result of a service-connected activity.
In 1973, he came to Great Falls, Montana, in part because he wanted to remove himself from the drug scene. He had used drugs on and off since the young age of 12 or 13 when he and his friends smoked marijuana that was growing wild near his home in Missouri. He later became involved with using cocaine, amphetamines and heroine.
Upon his arrival in Great Falls, Montana, he became actively involved with Opportunity Incorporated, a community action low income coalition of individuals who worked for welfare rights and the betterment of low income people. While associated with Opportunity Incorporated he became founder and president of L.I.N.C. (Low Income Neighbors Coalition). He helped organize a Christmas program for low income youngsters in the Great Falls area, and provided the time and initiative to get several projects developed before he left in May 1974 for the Veteran’s Hospital in Sheridan, Wyoming.
Insofar as can be determined, defendant had never been convicted of even a misdemeanor charge. Indeed, he has not even been arrested for any offense. The parole and probation officer spoke with several individuals in Great Falls concerning Coleman, and he stated in his report:
“This writer spoke with several individuals associated with the subject and familiar with his work in the Great Falls area and everyone that I talked with was complimentary of this individual’s work and viewed with some disbelief the crime this individual has committed.”
After his arrest, several persons performed psychological testing of defendant, and their diagnoses ranged from such determinations as paranoid schizophrenia; schizoidal personality; organic brain syndrome; depressive reaction; a patient with passive-aggressive personality; aggresive personality disorders; and depressive reaction with anxiety (Depressive Neurosis).
Although the above is not a complete profile of the defendant, I *358 have provided some background so that it can be shown that the findings of the sentencing court are barren of any considerations of defendant’s personal circumstances. The findings which were made are meaningless to a reviewing court. We cannot guess at how the sentencing court evaluated defendant’s individual circumstances. The United States Constitution will not permit us to guess.
After Furman v. Georgia (1972), 408 U.S. 238, 96 S.Ct. 2726, 33 L.Ed.2d 346 was decided, a great many states responded to this decision by enacting mandatory death penalty statutes. The 1973 Montana statutes allowed a consideration of mitigating circumstances, but the 1974 statutes eliminated a consideration of mitigating circumstances, thereby making the death penalty mandatory in certain situations specified in the statutes. However, the United States Supreme Court later decided in a series of cases that mandatory death penalties are unconstitutional. Woodson v. North Carolina (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; Coker v. Georgia (1977), 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982; and Roberts v. Louisiana (1977), 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637. It was on the basis of these cases that this Court in the first Coleman case declared Montana’s mandatory death penalty statute to be unconstitutional. State v. Coleman (1978), 177 Mont. 1, 579 P.2d 732, 741-742.
What the Court stated in Woodson, applies, of course, to this case:
“. . . respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender ... as a constitutionally indispensable part of the process of inflicting the penalty of death.” Woodson v. North Carolina, 428 U.S. at 304, 96 S.Ct. at 2991.
By the time this Court had declared the 1974 death penalty statutes unconstitutional (1978), the legislature in 1977 had already enacted new death penalty statutes in response to Woodson, Coker and Roberts, and in response to Gregg v. Georgia (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Jurek v. *359 Texas (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d. 929, and Proffitt v. Florida (1976), 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913. In Gregg, the court held that the decision to impose the death penalty must be:
“guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.” (Emphasis added.) Gregg v. Georgia, 428 U.S. at 199, 96 S.Ct. at 2937.
Any statutory scheme therefore, to meet due process requirements must consider not only the circumstances of the commission of the crime, but also the particular circumstances of the individual defendant.
Though it appears that the 1977 death penalty statutes allow a consideration of the particularized circumstances of the crime as well as the individual circumstances of the defendant, I shall demonstrate from the record that the sentencing court failed to consider and evaluate the individual circumstances of the defendant. Accordingly, the death sentence cannot pass the minimum standards established by the United States Supreme Court.
The statutory scheme enacted by the 1977 legislature is an attempt to comply with the demands of Gregg. It attempts to consider both the “particularized circumstances of the crime and the defendant.” Section 95-2206.8 relates only to the circumstances of the crime — that is, the aggravating circumstances under which the legislature has deemed should merit a consideration of whether or not to impose the death penalty. As far as the facts are concerned in this case, we are concerned only with one aggravating circumstance set forth in subsection (7), as the sentencing court determined specifically that aggravating circumstances did not exist under remaining subsections (1) through (6). Subsection (7) provides:
Section 95-2206.8 Aggravating circumstances are any of the following:
*360 “(7) The offense was aggravated kidnapping which resulted in the death of the victim.”
To impose the death penalty at least one aggravating circumstance must be found to exist under the statutory scheme. It was found to exist in this case, and therefore the sentencing court crossed the first hurdle allowing the imposition of the death penalty-
Mitigating circumstances required to be considered are set forth in section 95-2206.9, which contains eight subsections. (I have previously set forth this statute in its entirety.) Subsections (2) through (7) are concerned only with mitigating circumstances surrounding the commission of the crime itself. That is, they do not involve a consideration of the particularized circumstances of the defendant as opposed to the crime itself. The sentencing court entered specific findings negating the existence of any mitigating circumstances under subsections (2) through (7). The sentencing court, however, failed to comply with either subsection (1) or (8). Subsections (1) and (8) involve a consideration of the individual defendant himself. Because the individual defendant was not considered, the minimum requirements of Gregg have not been met and the sentence must be vacated.
Subsection (1) requires the court to consider the defendant’s past history as far as his involvement in crime. Subsection (8) requires the court to consider any other factor concerning the defendant that may be relevant in the decision-making process as to whether or not to impose the death penalty. I quote again from the statute:
“Mitigating circumstances. Mitigating circumstances are any of the following:
“(1) The defendant has no significant history of prior criminal activity.
“(8) Any other fact exists in mitigation of the penalty.” (Emphasis added.) Section 95-2206.9, R.C.M.1947.
As I have previously explained, it is the mandatory duty of the sentencing judge to make specific findings of both statutory ag *361 gravating circumstances and statutory mitigating circumstances. Moreover, section 95-2206.11, R.C.M.1947, requires that findings be made as to either the existence or absence of each aggravating or mitigating circumstance. This duty is imposed on the sentencing court regardless of what evidence may have been introduced by the parties at the presentence hearing. In the case of subsection (1), the sentencing court emasculated the record and the law. In the case of subsection (8), there is an utter failure to show affirmatively that the individual circumstances of the defendant were considered.
How did the sentencing court handle the factual determination of whether defendant had a “significant history of prior criminal activity?” I have previously quoted the sentencing court wherein he acknowledged that he was perplexed or annoyed shall we say, that defendant had no previous record. But one clue is provided by the statements of the sentencing court that he simply only acknowledged that defendant had no record of a previous felony conviction. Somehow the sentencing court had to establish that the defendant was a bad person before he committed the aggravated kidnapping, and therefore was beyond redemption. We thus arrive at the findings on this vital issue.
During the trial defendant’s accomplice, Robert Dennis Nank, testified that on the same day of the crimes involved here, both individuals burglarized a home in Roundup, Montana, stole some rifles, and later buried them near the Roundup airport. No one else testified to these facts and neither was there corroboration evidence of this testimony — for example, the recovery of the rifles, etc. But this testimony by Nank was the key to the sentencing court’s approach to subsection (1) of section 95-2206.9. Though the findings are convoluted, the effect of the findings is that the defendant did have a “significant history of prior criminal activity.”
We go first to the presentence investigation report as to defendant’s criminal background:
“FBI records indicate the subject has been found guilty of Deliberate Homicide, Aggravated Kidnapping, Sexual Intercourse *362 Without Consent. Date of arrest: October 24, 1974 in Forsyth, Montana.
“The current offenses are the only criminal activities this individual has ever been arrested for according to the FBI sheet submitted to this office. No other criminal records could be found.” (Emphasis added.)
In setting forth the facts of the crime, the presentence investigation report did refer to the burglary and theft of rifles from the Roundup house, which information was of course, taken from the State’s brief relating to the first Coleman appeal.
In entering its findings on the day of sentencing, the sentencing court stated that it was doing so based on the testimony and evidence presented at defendant’s trial, and based on the presentence hearing. There is no reference at all to any reliance on the presentence investigation report. Because there was no evidence presented at the presentence hearing, it is fair to conclude that the sentencing court relied entirely on the trial testimony in determining whether or not to impose the death penalty.
Accordingly, based entirely on Nank’s uncorroborated testimony as to the house burglary and theft of rifles, the sentencing court entered the following finding:
“1. That on July 4, 1974, the defendant and Robert Dennis Nank were on the road on Nank’s motorcycle on a journey which began at the Sheridan Veterans Administration Hospital in Sheridan, Wyoming, and continued through various towns in Montana, to Roundup, Montana. The two men burglarized a home in Roundup, Montana, on fuly 4, 1974, and stole several rifles which were subsequently buried near the Roundup Airport ...” (Emphasis added.)
From this initial finding the court then proceeded to tie it into subsection (1) which requires the sentencing court to determine whether the defendant has a “significant history of prior criminal activity.” Accordingly, in his second finding he concluded:
*363 “That the State has been unable to prove by means of record checks that the defendant has any other history of criminal activity. The only other criminal act which appears in the trial record in this case is the aggravated burglary of a home in Roundup, Montana, where certain guns were stolen by the defendant and Robert Nank on July 4, 1974. By reason of the foregoing, the credit in mitigation allowed by Section 95-2206.9(1) is not appropriate to this defendant.” (Emphasis added.)
Without expressly stating, in legal effect the sentencing court determined that on the basis of Nank’s uncorroborated testimony, the defendant did have a “prior history of criminal activity.”
This conclusion is clearly erroneous. First, the sentencing court had no right to establish a “prior history of criminal activity” based entirely on the uncorroborated testimony of Nank, who, by his own testimony, was defendant’s accomplice throughout the entire tragic events of July 4, 1974. Second, the effect of the finding, although not expressly stated, is that defendant did have a "prior history of criminal activity.” The acts used to place a blemish on the criminal history of the defendant occurred the same day as the aggravated kidnapping, and even according to Nank, were part of a continuous course of criminal conduct. This was not the legislative intent when it directed the sentencing court to determine under section 95-2206.9(1) if the defendant had a “prior history of criminal activity.” Events occurring on the same day as the crime in question hardly establish a “prior history of criminal activity.” Indeed, the conclusion reached here is more revealing as to the predisposition of the sentencing court than it is revealing of the previous life patterns of the defendant in relation to his propensity to commit crimes. The findings are totally unsupported by a reasonable construction of the record and interpretation of the law.
Having effectively consigned defendant to the ranks of a previous offender insofar as section 95-2206.9(1) is concerned, the court then entered the following conclusions with relation to aggravation and mitigation:
“The Court concludes as follows:
*364 “1. That the aggravating circumstances set forth in Section 95-2206.8, paragraph (7) exists for the reason following:
“That the offense of aggravated kidnapping was committed by the defendant and it resulted in the death of the victim, Miss Peggy Harstad.
“2. That none of the mitigating circumstances listed in Section 95-2206.9, R.C.M. are sufficiently substantial to call for leniency. That the only mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity.” (Emphasis added.)
This determination, when coupled with the findings, leads inescapably to the conclusion that the sentencing court established a “prior history of criminal activity” of the defendant by convicting him of a house burglary and theft which occurred on the same day as the aggravated kidnapping. Moreover, it is the findings (as opposed to the conclusions) which are controlling for purposes of satisfying sections 95-2206.9(1) and 95-2206.11. The finding was that by virtue of the Roundup burglary and theft “. . . the credit in mitigation by section 95-2206.9(1) is not appropriate to this defendant.” This is merely another way of saying that defendant did have a “prior history of criminal activity.” Because of this clearly erroneous finding, the death sentence cannot stand.
There is, moreover, an even more glaring reason why the death sentence cannot stand — the total failure to adhere to the minimum standards of Gregg, that the record affirmatively establish that the sentencing court considered not only the circumstances of the crime itself, but also the “particularized circumstances of . . . the defendant.” In this respect, the record is utterly barren, and the death sentence must be vacated. Since subsection (1) of section 95-2206.9 relates only to the individual’s “prior history of criminal activity” the only remaining section which can possibly apply to the “particularized circumstances of . . . the defendant” is subsection (8) of the same statute. It provides:
“Mitigating circumstances. Mitigating circumstances are any of the following:
*365 “(8) Any other fact exists in mitigation of the penalty.” (Emphasis added.)
Clearly, if the demands of Gregg are to be met, they must be met under this subsection. Otherwise, the statute itself would be unconstitutional because it did not allow a consideration of the “particularized circumstances of . . . the defendant.”
The question we must ask is a simple one: Did the sentencing court consider the “particularized circumstances of . . . the defendant” before reaching the decision to impose the death sentence, and if so, what findings or determinations did it make concerning defendant as an individual?
The only way a reviewing court can tell if the defendant as an individual entered into the decision-making process of the sentencing court, is if the record and findings indicate that has in fact been done. We cannot, in a case involving a sentence of death, assume or presume that it was done.
A reviewing court cannot guess as to whether the sentencing court considered and amply weighed the “particularized circumstances of . . . the defendant.” The reason is a simple one: We might make a wrong guess. Indeed, it would appear that section 95-2206.11 was enacted to eliminate that possibility and to provide a reviewing court with the requisite record to review the death sentence imposed. This statute provides in pertinent part:
“. .. the determination of the court shall be supported by specific written findings of fact as to the existence or nonexistence of each of the circumstances ... set forth in 95-2206.9 [Mitigating Circumstances]. The written findings shall be substantiated by the records of the trial and the sentencing proceedings.” (Emphasis added.)
If this statute, when construed along with section 95-2206.9 is to pass constitutional muster under the minimum standards established in Gregg, then it is clear that the record must affirmatively establish that the “particularized circumstances of . . the defendant” have been considered. If the sentencing court did not do this, *366 then the death sentence cannot be permitted to stand. The sentencing court therefore is required to make findings concerning the “partizularized circumstances of . . . the defendant”, and since written findings are required only when a death penalty is imposed, it must explain why it chose to disregard defendant’s individual circumstances in determining to impose the death penalty. The findings of the sentencing court must be examined in light of these requirements.
In findings a through e of the death penalty judgment, the sentencing court specifically found the absence of mitigating factors (2) through (7) of section '95-2206.9. Subsections (2) through (7) relate only to facts surrounding the commission of the crime itself. On the other hand, subsection (8) is ignored altogether. A reviewing court is left entirely in the dark as to whether the sentencing court even considered the “particularized circumstances of . . . the defendant.” In the judgment there is only one reference to subsection (8), and that is included in a general, virtually all-inclusive umbrella finding:
“That there is no evidence appearing, either in the record of the trial held in this cause or the special sentencing hearing accorded, supporting a finding of any of the circumstances in mitigation under the other number paragraphs of Section 95-2206.9, namely paragraphs (2) through (8). There is, likewise, no evidence of any facts which are operative in this case to mitigate the penalty in this cause . .” (Emphasis added.)
This finding hardly complies with the requirements of section 95-2206.11, let alone the demands of Gregg. We certainly learn nothing about the defendant from that finding.
The sentencing court stated in this finding that the absence of mitigating factors was gleaned from the trial itself and from the sentence hearing. This finding as to subsection (8) of section 95-2206.9 suggests two conclusions, neither of which satisfies the demands of Gregg. The first conclusion is that because no evidence was introduced at the sentencing hearing the sentencing court relied entirely on the record of the trial in reaching the decision to *367 impose the death penalty. But there is no evidence in the trial record as to the individual circumstances of the defendant, and even more importantly, if anything concerning the defendant’s individual situation was considered as a result of the trial record, we have no idea what it was. For the record is silent as to what, if anything, concerning the defendant, was considered and evaluated. Surely therefore, the sentencing court did not fulfill the demands of section 95-2206.11 or the minimum constitutional requirements of Gregg.
A second alternative is that one can be charitable to the sentencing court and conclude that because the presentence investigation report was officially made part of the record at the presentence hearing, the sentencing court would be presumed to have made use of it in determining whether or not to impose the death penalty. But in the record of the sentencing itself there is not one reference to the presentence investigation report, and neither is there a direct reference to it in the written findings and judgment. Again, on such an important matter this Court cannot assume or presume that the sentencing court considered and evaluated the “particularized circumstances of. .. the defendant.” It is either in the record and findings or it isn’t. It isn’t.
The result is that one cannot conclude from either situation that the sentencing court considered and evaluated the “particularized circumstances of . . . the defendant” before reaching its decision to impose the death penalty. This being so, the death sentence does not meet the minimum standards imposed by Gregg, and it must therefore be vacated.
There is no question that the sentencing court failed to comply with sections 94-2206.9, subsections (1) and (7). Its handling of the issue relating to defendant’s “prior history of criminal activity” is a mockery. The majority did not reach the issue of whether a “history of prior criminal activity” was established by acts committed on the same day as the aggravated kidnapping. It is true that the defendant did not raise this issue, or if he did, it was inartfully obscured in the broadside attack launched against the second *368 imposition of the death penalty; but nonetheless, it was the duty of this Court under automatic mandatory review, to determine this issue.
The same is true of the failure of the sentencing court to comply with the constitutional mandate of Gregg to consider the “particularized circumstances ... of the defendant.” Other than a consideration of a “history of prior criminal activity” as mandated under section 95-2206.9(1), R.C.M.1947, the only section that can possibly allow for a consideration of the “individualized circumstances ... of the defendant” is subsection (8) of section 95-2206.9. Here, there is a total failure of the sentencing court to show this Court what factors it considered and evaluated concerning the defendant as a person. Again, I must state that this issue was only tangentially raised by the defendant, and again it was undoubtedly inartfully obscured in the broadside attack which defendant launched against the second imposition of the death penalty. But again, the statutes mandated that we review the sentence imposed to determine its compliance with the law. Furthermore, the demands of Woodson and Gregg, leave no alternative for this Court but to determine if the record affirmatively shows a consideration of the “particularized circumstances ... of the defendant.” Since it does not, it is our duty to vacate the death penalty.
The automatic review provisions for death sentences are set forth in sections 95-2206.12 through 95-2206.15, R.C.M.1947 (now sections 46-18-307 through 46-18-310 MCA). Under section 95-2206.13, the imposition of all death sentences in this State requires this Court to review its legality and sufficiency. Section 95-2206.13 sets forth the priority of review accorded to death sentence cases, and in essence states that it shall take precedence over all other cases. Section 95-2206.14 requires that the entire record of the proceedings be forwarded to this Court.
The extent of review required is set forth in section 95-2206.15:
“Supreme court to make determination as to sentence. The supreme court shall consider the punishment as well as any errors *369 enumerated by way of appeal. With regard to the sentence, the court shall determine:
“(1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
“(2) whether the evidence supports the judge’s finding of the existence or nonexistence of the aggravating or mitigating circumstances enumerated in 95-2206.8 and 95-2206.9; and
“(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration.”
I cannot accept the majority’s conclusions that after an examination of subsections (1), (2), and (3) of section 95-2206.15, that the death sentence was properly and justifiably imposed. The majority simply failed in its duties of review.
Conceding arguendo that Nank’s uncorroborated testimony was sufficient to establish that defendant committed the house burglary and theft of rifles, the opinion is silent on the question of whether these acts, committed on the same day as the aggravated kidnapping, were sufficient to establish a “history of prior criminal activity.” This is not a question of fact. It is a legal question which this Court must answer, and has failed to do so. For this reason, the majority has not complied with section 95-2206.15(2).
Neither has the majority explained whether the record affirmatively establishes that the sentencing court considered and evaluated the “particularized circumstances of . . . the defendant” in order to be in compliance with section 95-2206.9(8), and the demands of Woodson and Gregg. Not having done so, it is clear that the majority has not complied with its review duties under section 95-2206.15(2). Under this section the record of the sentencing hearings and judgment must clearly establish the “existence or nonexistence of the aggravating or mitigating circumstances . .” (Emphasis added.) I note that the only reference in the majority opinion to any of the “particularized circumstances of . . the de *370 fendant” is in relation to the handling of the “prior history of criminal activity.”
Nor can I accept the conclusions of the majority that the death sentence was not, pursuant to section 95-2206.15(1), “imposed under the influence of passion, prejudice, or any other arbitrary factor.” The total circumstances do not support this conclusion.
Circumstantially, the conclusion is inescapable that the sentencing court orchestrated the proceedings from the very beginning so that in the event of a conviction of aggravated kidnapping, the death penalty would be imposed. Before trial on the merits, and after defendant had entered his plea of not guilty, and over defendant’s objection, the sentencing court on its own motion, amended the charge of aggravated kidnapping to allege that the crime resulted in the death of the victim. At the conclusion of the trial, he submitted a special interrogatory to the jury to ask it to determine whether the aggravated kidnapping resulted in the death of the victim. As a result of this amended information and special finding of the jury, the sentencing court placed himself in a position to impose the mandatory death penalty which was then required by statute. It matters not that this Court determined the amended information and submission of the special interrogatory to the jury, to be matters of form, and to be ultimately inconsequential because the death sentence was vacated. It certainly demonstrates the state of mind of the sentencing judge.
The same kind of active involvement is evident after this Court declared the mandatory death penalty under the then existing statutes under which defendant was sentenced, to be unconstitutional. Before the sentencing court received the remittitur from this Court, indeed, before this Court had ruled on defendant’s petition for rehearing, the sentencing court had ordered a presentence investigation report and ordered the defendant immediately returned from the state prison to be placed in the Custer County jail. Apparently on the same day as the remittitur was received by the sentencing court, it sent out an order setting a presentence hearing and stated that it would be conducted under the 1977 death penal *371 ty statutes. The sentencing judge ignored our decisions on issues three and eleven which clearly indicated that this Court did not contemplate that the death penalty would be a reconsideration upon resentencing. He read in everything he possibly could to construe the first Coleman opinion to mean he could apply the 1977 death penalty statutes retroactively.
At the sentencing hearing itself, he accepted and filed the presentence investigation report, but at least as far as the record is concerned, the sentencing court ignored it, and did not consider the “particularized circumstances ... of the defendant.” He stretched the law to the breaking point to saddle the defendant with a “history of prior criminal activity”, a clear misreading and misapplication of section 95-2206.9(1). He allowed final argument on the penalty to be imposed, only after he had predetermined the issue by coming to court armed with his written death sentence. He totally failed to consider the lenient treatment given to Nank who was by his own admissions, an equal participant in the crimes for which defendant was ordered to be hanged. Moreover, Nank had a previous felony record.
If these factors, individually, or at least collectively, do not demonstrate that the sentencing authority was “under the influence of passion, prejudice, or any other arbitrary factor” (emphasis added), I do not know what would. It is an easy matter for a reviewing court to find an absence of “passion, prejudice, or any other arbitrary factor” if it views the various factors in isolation, and does not consider them together. But, they must be considered together if meaningful review is to be provided under section 95-2206.15(1). Unfortunately, in this case, these factors were not considered in isolation, let alone collectively.
The only factor considered by the majority is the failure of the prosecution to give the same plea and sentencing considerations to defendant as he had given to Nank. But the majority has entirely missed the point — for two reasons. First, the sentencing court should have made some mention of the distinctions in the penalties handed out to Nank as opposed to the defendant, but failed to do *372 so. If the sentencing court thought there were legitimate reasons for treating the defendant differently, it was obligated to set forth those facts and reasons justifying the different treatment. This was not done, of course. Second, the majority misreads Gregg when it cites this case as justifying the different treatments.
The failure to properly apply Gregg results from the majority’s reliance on the prosecution’s brief in relation to Gregg. In its brief, the prosecution stated in response to defendant’s argument that defendant was the victim of arbitrary and capricious treatment being that Nank was shown leniency:
“Furthermore, leniency in one case does not invalidate the death penalty in others.” Gregg, 428 U.S. at 199, 224-226, 96 S.Ct. 2909.
In its opinion, the majority stated:
“Leniency in one case does not invalidate the death penalty in others.” Gregg 428 U.S. at 199, 224-226, 96 S.Ct. 2909.
The State made no effort in its brief to explain or expand upon this interpretation of Gregg, and neither did the majority opinion. Suffice to say that Gregg does not apply to the facts of this case. It was hardly appropriate for the majority to rely on this statement of the State in its brief as it is nothing more than a continuing and unrelenting effort to salvage the death sentence imposed in this case, without regard to a fair and dispassionate interpretation of the law or facts.
The basic thrust of the statement in Gregg was that a defendant handed the death sentence cannot complain that he has been the victim of arbitrary and capricious conduct simply because another defendant, in another case, has for some reason been the beneficiary of a prosecutor’s mercy. That is a far cry from the situation here where Nank admitted committing precisely the same crimes of which the defendant was convicted by a jury. But, Nank was shown mercy: the defendant was sentenced to hang. This can hardly be interpreted as a just and evenhanded application of the law.
On May 7, 1975, Robert Nank agreed to cooperate with the State *373 in its prosecution of the defendant. In exchange for this cooperation, he received certain benefits — primarily a dismissal of the charge of aggravated kidnapping charge which eliminated the possibility that the death penalty would be imposed. Sixteen days later, defendant Coleman, though still maintaining his innocence, offered to plead guilty to the same charges to which Nank had pleaded guilty, but insisted on maintaining his innocence. The State refused his offer. The case against defendant went to trial in essence because defendant refused to admit his guilt. Primarily on the basis of Nank’s testimony, he was convicted of all charges, including the crime of aggravated kidnapping.
The majority has grounded part of its opinion on the first Coleman case wherein the majority held that it was not improper for the prosecution to refuse to accept defendant Coleman’s conditional offer to plead guilty. Although the prosecutor did have the discretion to refuse this conditional plea offer, the consequences which followed are not fair in the slightest degree. Nor should they be tolerated.
Conceding that the prosecutor had the right to refuse the conditional plea offer, it does not establish that the conditional plea offer was constitutionally infirm. At least, that is the law of the United States Constitution. In North Carolina v. Alford (1970), 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162, it was held that there is no constitutional error in accepting a guilty plea which contains a protestation of innocence. Accordingly, at least, under the United States Constitution the prosecutor and sentencing court could have accepted the conditional plea of guilty. If they had, the defendant could not later withdraw his plea.
It is important to note however, that the record does not affirmatively establish why the conditional plea was not accepted. That is, it does not establish that the prosecutor would have treated defendant just like Nank if he would unconditionally plead guilty to the charges. We cannot conclude therefore, that the prosecutor ever promised defendant the same treatment as Nank. In terms of plea *374 bargaining the American Bar Association has established its position relating to similarly situated defendants:
“Similarly situated defendants should be afforded equal plea agreement opportunities.” (American Bar Association on Standards for Criminal Justice, Standards Relating to The Prosecution Function and the Defense Function, approved draft (1971), at 102.)
There is no showing in the record that the prosecutor ever offered the same terms to defendant as he did to Nank, and yet there is not a better illustration of similarly situated defendants. Under the circumstances of this case, there was a clear affirmative duty for the prosecutor to establish that he offered the same plea bargain to defendant as he did to Nank. The prosecutor did not and cannot meet that burden.
There is no question that absent Nank’s accomplice testimony, the State would have insufficient evidence to convict defendant. But once it struck the plea bargain with Nank it had the evidence to convict defendant of the charges if the jury believed Nank’s testimony. The record establishes, that is, Nank’s confession and Nank’s testimony at trial, establishes that Nank and defendant committed the same acts against the victim. The effect in terms of sentencing, however, is that because the State could not convict defendant without Nank’s testimony, it struck a bargain to keep one man alive in exchange for the possibility of ultimately putting one man to death — the defendant. The jury verdict against the defendant, based on Nank’s testimony, set in motion the ultimate imposition of the death penalty. Such disparate results from such similar criminal acts, cannot be countenanced by society, and certainly should never be countenanced by the courts. The majority has performed a great injustice by ratification of this unequal treatment.
There are two procedural matters concerning the sentencing proceedings that need some clarification. The majority has concluded that defendant was not deprived of an opportunity to present oral arguments at the presentence hearing, and moreover, that in *375 essence, defendant waived further rights to present meaningful arguments by not presenting proposed findings of fact to the sentencing court after having been invited to do so. On this basis, the majority concludes:
“Thus, defendant and his counsel had at least two opportunities to submit argument to the Court regarding the death penalty prior to July 10, 1978 hearing, but did not do so.”
This conclusion has greatly distorted the realities of the situation.
I have already discussed the proceedings which took place during the so-called sentencing hearing. As neither party submitted any evidence at the presentence hearing, and the only document filed at the presentence hearing was the presentence investigation report, it was agreed that both parties would submit briefs to the sentencing court with regard to their respective positions. This apparently was done, although this Court does not have the benefit of those briefs. In addition, the sentencing court invited both sides to submit proposed findings and conclusions, but only the prosecutor indicated positively that he would do so. The sentencing court did not tell the parties that submission of briefs would constitute a waiver of oral argument concerning the penalty to be imposed. It is logical to assume that before sentencing, defense counsel believed that he would have an opportunity to make a meaningful and effective oral argument against imposition of the death penalty. Clearly, the sentencing court did not comply with the spirit of section 95-2206.7, which provides in pertinent part:
“... The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.” (Emphasis added.)
The word “shall” is mandatory. For it to be meaningful, the implication is that argument shall be presented before the sentencing court makes its decisión. But such is not the case here. True, the sentencing court, on July 10, 1978, allowed defense counsel to argue against imposition of the death penalty, and the state to argue for imposition of the death penalty. But by this time the court had already decided to impose the death penalty. The sen *376 tencing court had come to court with its written death sentence already prepared. As I have previously mentioned, insofar as the defendant is concerned, this is akin to allowing defense counsel in a criminal case to make final arguments to the jury only after the jury has returned with its guilty verdict. Under these circumstances, it cannot be reasonably argued that defendant was given a meaningful opportunity to argue against the death penalty when the decision to hang had already been made. This not only violated the spirit of section 95-2206.7, it also constitutes a denial of the effective assistance of counsel.
Nor is it reasonable to conclude as did the sentencing court, and the majortiy here, that defendant effectively waived another opportunity to argue against the imposition of the death sentence by failing to submit proposed findings of fact and conclusions of law. It is true that the sentencing court invited defense counsel and the prosecutor to submit proposed written findings and conclusions; but only the prosecutor responded that he would do so. The prosecutor did present proposed findings and conclusions. But does the sentencing court truly believe, does the majority truly believe, that the tide could well have been turned for the defendant if only his lawyer had presented proposed findings of fact? How far must we bury our head in the sand?
Indeed, the statute calling for “specific written findings of fact” clearly operates only when a decision is made to take a defendant’s life. Section 95-2206.11, provides in relevant part:
“In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact . . (Emphasis added.)
This statute leaves no doubt that findings are required only in the event of a decision to impose the death penalty; and the statute certainly places no duty upon the defendant to make those proposals. The duty is that of the court and the court alone to support its death sentence with the required “specific written findings of fact.” To impose a duty and burden of persuasion upon the defendant to present his own proposed findings of fact is clearly beyond *377 the contemplation of the statute, and beyond any duty that this Court should gratuitously impose on the defendant.
What if the defendant’s counsel did submit proposed findings of fact? We may safely assume they would have led to the inexorable conclusion that defendant’s life should be spared. But, if the sentencing court spared defendant’s life, the proposed findings would not serve any function whatsoever. Since the decision to grant mercy is one in which no findings of fact are required, and it also being obvious that the State has no appeal from such a decision, the proposed findings most likely would have found their way to the trash can. Furthermore, the majority ignores the primary function of findings of fact in terms of the decision-making process at the trial level.
If trial judges and trial lawyers are candid, they will admit that proposed findings are prepared and submitted by counsel to assure that in the event the trial court finds in their favor that all the bases are covered in the event of an appeal. They are submitted possibly with the hope, but rarely if ever, with the expectation that the proposed findings will actually be a decisive factor in influencing the trial court to rule in favor of one’s client. Indeed, it has been my experience, and an unfortunate one from the standpoint of appellate review, that most often the trial court simply rubber stamps the proposed findings of the winning side. Rarely do we get any insight as to what the decision-making process was, or how the trial court in fact viewed the evidence at trial. In the instant case, I do not know how closely the findings of fact parroted the proposed findings submitted by the prosecutor, as the proposed findings are not a part of the record on appeal.
An examination of the findings entered in this case does not give a reviewing court any insight as to what the fact finder was thinking; that is, what factors were actually involved in motivating and impelling his decision to impose the death penalty. The findings are cold and calculated and set out with staccato precision — but hardly a revelation as to the reasons for concluding the defendant must die. In considering and weighing the totality of circumstances sur *378 rounding the commission of the crimes by defendant, and by Nank, and in considering and weighing the totality of circumstances surrounding the “particularized circumstances of . . . the defendant”, what actually impelled the sentencing court to sentence defendant to hang while at the same time he knew that an equally guilty accomplice would not hang? The record is silent as to these factors — the real reasons hidden forever in the bosom of the court. The findings are more revealing for what they don’t say than for what they do say.
It is clear beyond question that defendant’s presentation of proposed findings, in addition to not being required, would have been a manifest exercise of futility. Findings of fact collaborated in by a thousand William Shakespeares could not have deterred the sentencing court from its chartered course. Does any member of the majority truly believe otherwise? Under these circumstances to conclude that proposed findings of fact are a form of argument calculated to have and with a reasonable possibility of having a certain persuasive effect on the sentencing court, is utter nonsense.
Before discussing the majority position that only cases involving imposition of the death penalty must be reviewed by this Court, I emphasize that I do not contend defendant would have to be treated exactly like Nank in terms of the sentencing imposed. In the case of Nank, the charge of aggravated kidnapping was dropped as part of a plea bargain agreement and obviously he could not be sentenced at all for that crime. But since defendant was convicted by a jury of three crimes (including, of course, that of aggravated kidnapping), he could have been sentenced for all three crimes. The sentencing court went one step too far when it sentenced the defendant to hang.
One of the purposes of appellate review is as the majority states, “[to] serve as a check against the random or arbitrary imposition of the death penalty”, citing Gregg, 428 U.S. at 206, 96 S.Ct. at 2940. But Gregg did not hold that only other death penalty sentences need be compared. Nor do I believe the Georgia case relied on by the majority (Moore v. State (1975), 233 Ga. 861, 213 S.E.2d 829) *379 is authority for the majority position in light of the wording of the statutory review scheme in this state. Section 95-2206.15 does not so limit our review. It provides in relevant part:
“Supreme Court to make determination as to sentence.
“The supreme court shall consider the punishment as well as any errors enumerated by way of appeal. With regard to the sentence, the court shall determine:
“(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. The court shall include in its decision a reference to those similar cases it took into consideration.”
If only a comparison with other death sentences was intended, the legislature would have inserted the word “death” before the word “penalty”.
If the actual purpose of mandatory review (mandated by the United States Constitution) is to check against “the random or arbitrary imposition of the death penalty”, I fail to see how such review can be fairly and effectively fulfilled without a comparison with those cases wherein the death penalty could have been imposed, but for some reason was not. Factors which may lead a sentencing court to not impose the death penalty may well be worthy of consideration by a reviewing court in determining whether a particular case under review merits the same considerations. A sentencing judge may have sound and persuasive reasons why he did not impose a death penalty in a particular case. This court should not deny access to this decision in determining whether or not a case we are reviewing may merit the same outcome.
I am not unaware, however, of the practical problems involved in getting access to such cases. For example, section 95-2206.11, which I have previously discussed in relation to another point, clearly requires “specific written findings of fact” only when the death penalty is imposed. If such findings are not entered, and if a decision of a sentencing court is not filed explaining its reasons for not imposing a death sentence in a particular case, for all practical *380 purposes this Court would be deprived of the benefit of this decision for review purposes. But, I believe that a failure to use such cases for comparison is a denial of effective review, particularly since mandatory review is required by decisions of the United States Supreme Court.
There are additional practical problems in seeking to fairly apply a statutory scheme of capital punishment. The vagaries of the components entering into the decision-making process of the prosecutor and the sentencing judge are too many and mostly never became a matter of record so that a reviewing court can consider them. Whether the death penalty will be imposed in a particular case will depend almost entirely on the personal beliefs and attitudes of the prosecuting attorney and the judge who is on the case. Many prosecutors would be loathe to seek the death penalty. On the other hand there are those who would not hesitate in determining that the death penalty is the appropriate and only punishment. The same is true of the judge who is on the case. Many judges would be loathe to impose the death penalty. On the other hand, there are those who are known as “hanging judges”. To them, the death penalty should be imposed more often and in a wider variety of cases. Furthermore, there are many political considerations which operate upon prosecutors and judges in determining whether the death penalty will be imposed. A defendant may be sentenced to death solely because the right combination of prosecutor and sentencing judge operated in tandem in reaching the decision to impose the death penalty.
Of course, many decisions are made disposing of the death penalty aspects of a case long before a defendant either pleads guilty to a capital crime or is found guilty by a jury. In many cases, a threat of the death penalty hanging over a defendant may induce him to plead guilty to a crime in exchange for the promise of a prosecutor to eliminate the death penalty aspects of the charge involved, or a promise not to seek the death penalty. It would be extremely difficult, to say the least, for a reviewing court to obtain sufficient information concerning these cases so as to compare them with a death sentence currently under review.
*381 I point out these factors only to stress my belief that it is virtually impossible to rationally and fairly administer and enforce a statutory scheme of capital punishment. But since capital punishment as a permissible means of punishment seems now to be an accomplished fact, this Court should spare no efforts in seeing that it is administered as fairly as we are capable of doing it. To use only cases imposing the death penalty as a comparison with a case under review, fails miserably in this objective. Somehow the whole process of meaningful appellate review is diminished.
The majority has dismissed with no meaningful discussion the defendant’s contention that a jury should have been allowed to determine whether or not the death penalty should be imposed. Perhaps it is not a constitutional requirement under the United States Constitution, but I am convinced that in the long run, with all the inherent frailties which a scheme of capital punishment entails, a jury will arrive at a more evenhanded application of the law to the facts than will a judge. There are no sound policy reasons why, with appropriate guidelines and instructions, a jury should not be allowed to make that fateful and final decision as to whether a person will live or die. We entrust juries with very important decisions in our legal system; there is no reason why we should not entrust them with this ultimate decision. The ultimate power of life or death should never be reposed in a single person as it is under our present statutes.
If a jury had decided this case, I am convinced that it would immediately have recognized the fundamental unfairness of allowing Nank to live but ordering Coleman to die. A jury would have established its own fundamental fairness and sense of justice by deciding that neither should Coleman be compelled to pay with his life. If a jury is the “conscience of the community”, there is every reason for allowing this collective conscience to render a final verdict as to life or death.
I arrive now at the final matter for discussion, and that is whether the judge who imposed the initial death penalty should have been permitted to again preside at the second sentencing. This *382 question was not directly raised by defendant, but it was impliedly raised by his contention that he was denied opportunities for effective argument during the proceedings relating to the second sentencing. Clearly, the sentencing judge should not have presided over the second sentencing. But the problem arises as to the steps to be taken to obtain a new judge for the second resentencing. Plainly stated, there is no procedure other than the sentencing judge voluntarily stepping aside for the second sentencing.
It is clear from the beginning of this case that the sentencing court had an inordinate amount of involvement directed to the ultimate end of imposing the death penalty. By amending the information after defendant had entered his plea of not guilty and over the objection of defendant, and by submitting the special interrogatory to the jury, the sentencing court expressed an undeniable interest in the crime of aggravated kidnapping. A conviction of that crime mandated the imposition of the death penalty. By virtue of the amended information and the jury’s answer to the special interrogatory, the defendant was then in a position where the mandatory death penalty could be imposed. This involvement continued immediately after this Court declared the 1974 death penalty statutes to be unconstitutional when the sentencing court immediately sent a letter to counsel that he would conduct a sentencing hearing under the 1977 death penalty statutes. I have elsewhere related the additional activities of the sentencing court in ultimately deciding to impose the death penalty.
Unfortunately, our present court rules on disqualification do not provide for the disqualification of a judge in a situation where a case has been remanded only for resentencing as opposed to a reversal for a new trial. This rule is set forth in 34 St.Rep. 26. In the context of this case, this rule provides only that a party can file a peremptory motion to substitute a judge if this Court has ordered a new trial. There is also a provision for disqualification for cause, but it is extremely difficult to invoke, and rarely is a successful instrument of obtaining a change of judge. There is an argument that the peremptory disqualification rule could be interpreted to apply also to a remand for resentencing, but in any event, defendant did *383 not move to peremptorily disqualify the sentencing judge. Accordingly, that issue is not directly before this Court.
Nonetheless, this case raises some fundamental problems concerning the right to a new judge for resentencing, particularly when the death penalty has already been imposed the first time and there is even the slightest possibility that it will again be imposed. The policy behind the right to a new judge after a reversal was stated in King v. Superior Court, In and For County of Maricopa (1972), 108 Ariz. 492, 502 P.2d 529, where the Arizona Supreme Court stated:
“In the case of an appeal, reversal and a remand for a new trial, it is always possible that the trial judge may subconsciously resent the lawyer or defendant who got the judgment reversed. The mere possibility of such a thought in the back of a trial judge’s mind means that a new judge should be found.” (Emphasis added). 502 P.2d at 530.
In that case the Arizona Supreme Court was construing a rule of procedure similar to the rule of this state. There is no reason, of course, why this same “mere possibility would not exist in the case of a remand for resentencing. Without question the “mere possibility” would exist in a case where there was even the slightest possibility that the death penalty could again be imposed upon the resentencing. Under these circumstances, there is absolutely no reason why the defendant should have to face the same judge twice.
The problem however is that Montana’s rule, like Arizona’s, is not self-executing. Unless a trial judge or sentencing judge has a twinge of conscience and voluntarily steps aside, there is no way presently to make him do so. The problem is more complicated here because the defendant did not ask the sentencing judge to step aside. Nonetheless, where such an extreme penalty such as the death penalty is involved, I think it incumbent upon this Court to make our own determination as to whether, under the objective reasonable man test, the defendant was deprived of a fair and impartial judge to preside over the sentencing hearing and to ultimately impose sentence.
*384 There is no question that the sentencing court should have known that a reasonable man would look askance at his again presiding over the resentencing. He should have disqualified himself; but being that he did not do so, this Court should not allow the death sentence to stand based on an application of the reasonable man test. In criminal trials (which obviously must include criminal sentencings) the American Bar Association has adopted standards that provide:
“The trial judge should excuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can reasonably be questioned.” American Bar Association on Standards for Criminal Justice The Function of the Trial Judge, (1972), p. 8.
The test for determining when a trial judge should step aside is an objective one, not a subjective one. It has been stated as follows:
“Would a person of ordinary prudence knowing all of the facts known to the judge find that there is a reasonable basis for questioning the judge’s impartiality?” The Code ojJudicial Conduct — The First Five Years (1977), Utah L.Rev. at 402.
Although this Court has not adopted this Code of Judicial Conduct, the rule is but a rule of common sense and has existed long before the adoption of the canons discussed in the law review article.
In the case of In re Hupp’s Estate (1955), 178 Kan. 672, 291 P.2d 428, 432, the Kansas Supreme Court reiterated the rule declared in Tootle v. Berkley (1899), 60 Kan. 446, 56 P. 755, where it stated: “. . . when circumstances and conditions surrounding litigation are of such nature they might cast doubt and question as to the fairness or impartiality of any judgment the trial judge may pronounce, such judge, even though he is not conscious of any bias or prejudice, should disqualify himself and permit the case in question to be tried before a judge pro tem.”
It is true that these cases were decided under circumstances where a party moved at the lower court to remove a judge from a case, but where he refused; or where a party was successful in *385 removing a judge from the bench, ,but where the other parly contended upon appeal that the judge should not have removed himself. But if these rules are to have any substantive meaning, particularly in a death penalty case, it should not be necessary that the defendant have moved to have the judge step aside in favor of another judge. The sentencing court should be ever mindful that this Court will, under the reasonable man test, scrutinize the proceedings, and if we determine that the sentencing judge has failed the reasonable man test, we will remand the case for resentencing and order a new judge to preside.
In a death penalty case, this Court has an overriding duty, regardless of the existing rules of procedure governing the disqualification of judges, to determine if from the entire record and the totality of circumstances, the defendant has had a fair hearing. Here, he clearly did not. I would vacate the death penalty and order that a new judge be called in to preside over the sentencing hearings.
To set forth my positions concerning the sentencing hearing, and more particularly, the written findings of fact entered by the sentencing court, I have of necessity had to quote from many of the written findings. There is always the danger that the reader may conclude that if the written findings were reviewed in their entirety perhaps they would not support my position. For this reason, I have appended to this dissent as Exhibit A, an exact copy of the Findings, Conclusions, Judgment and Order entered by the sentencing court on July 10, 1978, whereby the defendant was sentenced to hang.
For all of the foregoing reasons I would vacate the death sentence imposed in this case, order that a different district judge be called in to preside again at the sentencing of defendant, and further order that the death penalty is not to be considered.
*386 IN THE DISTRICT COURT OF THE SIXTEENTH JUDICIAL DISTRICT OF THE STATE OF MONTANA, IN AND FOR THE COUNTY OF ROSEBUD
STATE OF MONTANA )
Plaintiff )
) No. 1083
vs )
) FINDINGS, CONCLUSIONS, DEWEY EUGENE COLEMAN ) JUDGMENT AND ORDER Defendant )
Pursuant to an Information filed on the 24th day of October, 1974, Dewey Eugene Coleman, defendant herein, was charged with the crimes of Deliberate Homicide, Aggravated Kidnapping and Sexual Intercourse Without Consent. A jury trial commenced October 23, 1975, and continued through November 14, 1975, at which time the Jury returned verdicts of “guilty” on the three counts. On November 21, 1975, this Court sentenced Coleman to the maximum punishment on each .charge, that is: The defendant was sentenced to death for Aggravated Kidnapping; he was sentenced to 100 years for Deliberate Homicide; and he was sentenced to 40 years for Sexual Intercourse Without Consent. These sentences were ordered to be served consecutively.
This matter was appealed to the Montana Supreme Court, which in its decision of April 26, 1978, upheld each of the three convictions, but remanded this matter for re-sentencing. The Supreme Court held that there was no showing of the infliction of bodily injury during the course of the rape of the victim, and that, therefore, in the absence of that aggravating circumstance the maximum penalty for the crime is 20 years. The Supreme Court also held that Section 94-5-304, R.C.M.1947, is unconstitutional because it proscribes a mandatory imposition of the death penalty. The Court rejected the defendant’s claim that two jurors were excused for cause of violation of the Witherspoon Rule because of their views on capital punishment. The Court limited its decision on over turning *387 the death penalty to the absence of procedural requirements allowing the trial Court to consider any mitigating circumstances in its imposition of a penalty under the unconstitutional death penalty statute. The Court stated, as follows:
“Under this statute, if the court finds, as it did in this case, that the victim of an aggravated kidnapping died as a result of the crime, the convicted defendant must be sentenced to die. There is no provision for the trial court to consider any mitigating circumstances. It only allows the court to determine the aggravating circumstances of death. This is not constitutionally permissible.
To have a constitutionally valid death penalty, the United States Supreme Court has established certain necessary procedures. See: Gregg v. Georgia, (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; Proffitt v. Florida, (1976), 428 U.S. 242, 94 S.Ct. 2960, 49 L.Ed.2d 913; Jurek v. Texas, (1976), 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d. 929. None of those required procedures are present in Montana’s death penalty statute as it existed in 1974, nor were they provided otherwise in this case. Thus, defendant’s death sentence cannot stand.”
On the 14th day of June, 1978, a separate sentencing hearing was held to determine the existence or non-existence of aggravating circumstances or mitigating circumstances in line with the provisions of Sec. 95-2206.6, 95-2206.7, 95-2206.8 and 95-2206.9, R.C.M.1947. At time of the sentencing hearing the defendant filed a Motion to Quash, and when offered an opportunity to present evidence or any matter in mitigation, declined to do so. Following the hearing the court granted the state and the defendant time to file briefs particularly with reference to defendant’s Motion to Quash. Briefs and the law having been considered, the trial court addresses the principal legal issues raised.
As noted by Coleman in his appellate brief (pp. 178, 179) Sec. 95-5-304, R.C.M.1947, originally provided that “A court shall impose the sentence of death following conviction of aggravated kidnapping if it finds the victim is dead as a result of the criminal conduct [unless there are mitigating circumstances.”] The legislature *388 amended this section by striking the portion of the language underlined above. This legislative action, made it clear that the sentencing court need not consider mitigating circumstances upon conviction of aggravated kidnapping. As pointed out above the statute as amended was declared unconstitutional in this case, but the Supreme Court in remanding for resentencing did not specifically declare if the trial court could or could not impose the death penalty. Coleman argues that since the mandatory statute was declared unconstitutional, Coleman cannot be sentenced to death under laws enacted after his conviction.
The Supreme Court at page 11 of its opinion indicates that if the death penalty had been imposed under proper procedural safeguards, the sentence would have been upheld. The Court states:
“To have a constitutionally valid death penalty, the United States Supreme Court has established certain necessary procedures, (citations) None of these required procedures are present in Montana’s death penalty statute as it existed in 1975, nor were they provided otherwise in this case, (emphasis supplied) Thus defendant’s death sentence cannot stand.”
The emphasized language strongly suggests that if the sentencing court had observed procedural requirements declared by recent U.S. Supreme Court decisions, the death penalty would have been upheld notwithstanding that Montana’s mandatory law was unconstitutional.
The later enactment of Sections 95-2206.6, et seq., spelling out the procedure, should not operate to take away the court’s power to impose the death penalty under proper procedural safeguards. The death penalty is an operative fact under the Montana Constitution and Section 95-5-303, R.C.M.1947, and are not to be ignored because a procedurally defective statute is abrogated and other statutes are substituted therefor. As argued by the State from the Dobbert case, the circumstance that the defendant is afforded greater procedural protection by the trial court’s utilization of sections 95-2206.6, et seq., does not fall within the prohibition of ex post facto laws.
*389 In summary, the trial court in now pronouncing sentence is in a position to utilize the interim developments in sentencing procedure as reflected in recent U.S. Supreme Court decisions and the Montana statutes enacted in response thereto.
Both parties having been given the opportunity to place before the Court all matters each deemed relevant and competent bearing upon a determination of appropriate sentences to be imposed upon the three guilty jury verdicts rendered, and the Court having reviewed all matters submitted, together with the evidence produced at trial, and after observing the defendant’s demeanor during the trial and while testifying on his own behalf, the Court now makes the following Findings, Conclusions, Judgment and Order.
FINDINGS
1. That on July 4, 1974, the defendant and Robert Dennis Nank were on the road on Nank’s motorcycle on a journey which began at the Sheridan Veterans Administration Hospital in Sheridan, Wyoming, and continued through various towns in Montana to Roundup, Montana. The two men burglarized a home in Roundup, Montana, on July 4, 1974, and stole several rifles which were subsequently buried near the Roundup Airport. Later in the day the two men decided that they would rob someone along U.S. Highway No. 12 between Roundup, Montana, and Forsyth, Montana, and that they would kill the witnesses to destroy the evidence. With the motorcycle alongside the road, they began hitchhiking. A car occupied by a Mr. and Mrs. Paul Koester of Forsyth, Montana, stopped, but were frightened and left hurriedly as the defendant moved to obtain entry into the vehicle. At about 10:00 P.M. Miss Peggy Harstad of Rosebud, Montana, stopped and offered the two men a ride. They took control of her and her automobile, tied her with a rope and took her to a remote location north of Vananda, Montana, where both men attempted to engage sexual intercourse without consent with her. The victim was in menstruation at the time. Holding her upon her back in the rear of the automobile, the defendant engaged in the act of sexual intercourse without consent, while the victim pleaded with him not to. They drove through For *390 syth to a secluded spot adjacent to the frontage road just east of Forsyth, Montana, where Coleman announced his decision to kill Miss Harstad. They then drove back through Forsyth to the bridge on U.S. Highway No. 12 over the Yellowstone River to an isolated area across the Yellowstone River from Forsyth near an abandoned Milwaukee Railroad depot. In this area Coleman initiated the assault upon the victim by swinging his motorcycle helmet by the chin strap and crashing it against the victim’s head. Then the defendant placed the yellow nylon rope around the victim’s neck and attempted to strangle her. Then both the defendant and Robert Nank carried the victim down to a slough and, the defendant held her under the water. The victim rose out of the water briefly and then both men went into the water and held her under until she expired.
2. That the State has been unable to prove by means of record checks that the defendant has any other history of criminal activity. The only other criminal act which appears in the trial record in this cause is the aggravated burglary of a home in Roundup, Montana, where certain guns were stolen by the defendant and Robert Nank on July 4, 1974. By reason of the foregoing, the credit in mitigation allowed by Section 95-2206.9(1) is not appropriate to this defendant.
3. That there is no evidence appearing, either in the record of the trial held in this cause or the special sentencing hearing accorded, supporting a finding of any of the circumstances in mitigation under the other numbered paragraphs of Section 95-2206.9, namely paragraphs (2) through (8). There is, likewise, no evidence of any facts which are operative in this case to mitigate the penalty in this cause. The Court therefore finds, as follows:
a. That the offenses charged and proven in this cause were not committed while the defendant was under the influence of any mental or emotional disturbance; and
b. That in committing the acts charged and proved the defendant did not act under extreme duress or under the substantial domination of another person, rather the defendant’s decisions to *391 kidnap, rape and murder were the result of conscious deliberation and were his independent decisions arrived at despite contrary arguments advanced by Robert Nank against the murder of the victim; and
c. That the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired; and
d. That the victim was not a participant in the defendant’s conduct and did not consent to any of the acts, rather that she resisted, and pleaded with the defendant at various times throughout the course of events which resulted in her death; and
e. That the defendant was not a relatively minor accomplice, nor was his participation in the offenses relatively minor, rather that the defendant was the decision-maker and the dominating influence in the criminal acts committed against the victim; and
f. That the defendant at the time of the commission of the offenses was 27 years of age.
4. That at the prior sentencing hearing, this Court imposed the sentence of 100 years for the crime of deliberate homicide. That at the prior sentencing hearing the Court imposed the sentence of 40 years for sexual intercourse without consent; that these sentences were ordered to run consecutively.
CONCLUSIONS
The Court concludes as follows:
1. That the aggravating circumstances set forth in Section 95-2206.8, paragraph (7) exists for the reason following:
That the offense of aggravated kidnapping was committed by the defendant and it resulted in the death of the victim, Miss Peggy Harstad.
2. That none of the mitigating circumstances listed in Section 95-2206.9 R.C.M. are sufficiently substantial to call for leniency. That the only mitigating circumstance technically present in this cause is that the defendant has no record history of prior criminal activity.
From the foregoing Findings and Conclusions, the Court now renders its
*392 JUDGMENT AND ORDER
as follows:
1. The defendant, Dewey Eugene Coleman, having been found guilty of the crime of Aggravated Kidnapping by a jury on November 14, 1975, and the Court having specifically found beyond a reasonable doubt that the aggravating circumstances set forth in Section 95-2206.8(7) exist in relation to this offense, and that no circumstances exist in mitigation of the penalty, the defendant, Dewey Eugene Coleman, is hereby sentenced to death for the crime of Aggravated Kidnapping. Said punishment is to be inflicted by hanging Dewey Eugene Coleman by the neck until he is dead between the hours of six o’clock A.M. and six o’clock P.M. on the 31st day following the completion of the automatic review of this case by the Montana Supreme Court. The execution of said sentence shall be supervised by the Sheriff of Yellowstone County pursuant to Section 95-2303 R.C.M.1947.
2. The defendant, Dewey Eugene Coleman, having been found guilty of the crime of Sexual Intercourse Without Consent by a jury on November 14, 1975, the defendant, Dewey Eugene Coleman, is hereby sentenced to be imprisoned in the Montana State Penitentiary for a term of 20 years for the crime of Sexual Intercourse Without Consent.
3. The sentences hereby imposed are to be served consecutively with the sentence of 100 years for Deliberate Homicide which is not disturbed hereby. The defendant is hereby remanded to the custody of the Rosebud County Sheriff to be transported by him to the Montana State Penitentiary to await the final order of this Court pertaining to the execution of the remainder of the sentence herewith imposed. The defendant is to receive credit for time served, from the date of his initial incarceration on these charges on October 17, 1974, to the date of this judgment.
Dated this 10th day of July, 1978.
I si A.B. Martin
District Judge
cc: John S. Forsythe
Charles F. Moses